FILED

2014 Aug-21  AM 08:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRIDGIT B. DAVIS-YOUNG,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:12-CV-02851-RDP** |
| | } | |
| **PROTECTIVE LIFE CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. #18), filed on October 21, 2013.  The Motion (Doc. #18) has been fully briefed. (Docs. #20, #23, #25).  For the reasons stated below, the Motion (Doc. #18) is due to be granted.

## I.      Procedural History

Plaintiff Bridgit B. Davis-Young ("Plaintiff") initiated this lawsuit by filing a Complaint (Doc. #1) on August 31, 2012.   Defendant Protective Life Corporation ("Defendant" or "Protective") responded by filing an Answer (Doc. #5) on September 26, 2012.  On October 21, 2013, Defendant filed a Motion for Summary Judgment (Doc. #18), along with Evidentiary Materials (Doc. #19) and a Supporting Brief (Doc. #20).  On November 18, 2013, Plaintiff filed a Response (Doc. #23) and Evidentiary Submissions (Doc. #24),[1] and Defendant filed a Reply

---

[1] Defendant takes issue with Plaintiff's Response (Doc. #35) and Evidentiary Submissions (Doc. #36), arguing that sections of each contain inadmissible hearsay and/or are not based on personal knowledge.  Defendant seeks to have portions of them removed from summary judgment consideration by way of a Motion to Strike (Doc. #26).   However, because the court reaches the same conclusion regarding Defendant's Motion for Summary Judgment (Doc. #18) even when taking into full account the disputed portions of Plaintiff's documents, Defendant's Motion to Strike (Doc. #26) is moot.  Furthermore, Plaintiff's "Second Motion for Protective Order" (Doc. #27) is, in actuality, not a motion, but a response to Defendant's Motion to Strike.  Accordingly, Plaintiff's "Motion" (Doc. #27) is due to be administratively terminated.

(Doc. #25) on November 27, 2013, rendering Defendant's Motion (Doc. #18) properly under submission.

## II.     Facts[2]

Plaintiff is a black female who began working at Protective in 1998. (Doc. #1 at 2; Doc. #19, Ex. 1, Pl. Dep. at 39).  Over the course of her time at Protective, Plaintiff occupied a variety of positions, including list bill representative (1998-2000), call center analyst (2000-07), and customer service associate (2008-11). (Doc. #19, Ex. 1, Pl. Dep. at 39).

Less than a year after Plaintiff began working as a list bill representative, she was issued a "Work Performance" memorandum from her supervisor, Tina Hill. (Doc. #19, Ex. 2 at 10-11). Ms. Hill, a black female, informed Plaintiff that her "performance [had] not improved as expected, and [was] not acceptable for someone who [had] been in [her] position for nearly a year." (Doc. #19, Ex. 1, Pl. Dep. at 310; Doc. #19, Ex. 2 at 10).  As a result, Plaintiff was warned that she would be subject to probation and possible termination if she did not make an immediate and permanent improvement in her productivity and work habits. (Doc. #19, Ex. 2 at 10).

In 2008, Plaintiff joined the Special Processing Team, working as a customer service associate on the status team. (Doc. #19, Ex. 1, Pl. Dep. at 39; Doc. #19, Ex. 5, Nichols Dep. at 13).  Throughout her time on the Special Processing Team, Plaintiff's supervisor was Andrea Nichols ("Ms. Nichols"), a white female. (Doc. #19, Ex. 1, Pl. Dep. at 112).  Her initial trainer on the Special Processing Team was Alexis Poole, a black female, but Ms. Poole was later replaced by Camy Parks, a white female. (Doc. #19, Ex. 1, Pl. Dep. at 71-73, 310).  During her

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

first year on the Special Processing Team, Plaintiff was counseled for lengthy personal phone calls, attendance issues, and failure to meet production standards. (Doc. #19, Ex. 1, Pl. Dep. at 116-19, 126; Doc. #19, Ex. 2. at 55-57, 61).

In February 2009, Ms. Nichols counseled Plaintiff over her lack of productivity, memorializing the conversation in a memorandum. (Doc. #19, Ex. 3 at 3).   While working overtime, Plaintiff processed only 3.07 items per hour (the average minimum by others being 12 items per hour), prompting Ms. Nichols' intervention. (Doc. #19, Ex. 3 at 3).   Throughout the rest of 2009, Ms. Nichols and other Protective supervisors addressed a plethora of work-related issues with Plaintiff (Doc. #19, Ex. 3 at 6-14), culminating in the issuance of a Corrective Action Form ("Final Warning") in December of that year (Doc. #19, Ex. 3 at 21-22).   The Final Warning stated that Plaintiff was not meeting expectations "in the areas of production and attendance," and warned that failure to improve would result in further disciplinary action, "up to and including termination of [her] employment." (Doc. #19, Ex. 3 at 22).   At a required follow-up meeting in January 2010, Plaintiff was informed by Ms. Nichols that her performance was improving. (Doc. #19, Ex. 3 at 25).   However, Plaintiff's 2009 Year End Review, which she received in January 2010, still bore an overall rating of "Needs Improvement." (Doc. #19, Ex. 3 at 26-31).

In July 2010, Plaintiff received her Mid Year Review, in which her overall rating was listed as "Meets Expectations." (Doc. #19, Ex. 3 at 37-42).   The Rule 56 record evidences, however, that Plaintiff's productivity regressed and Ms. Nichols was required to discuss the topic with her again in October 2010. (Doc. #19, Ex. 3 at 49).   In January 2011, Ms. Nichols gave Plaintiff her 2010 Year End Review, which included an overall rating of "Needs Improvement" and advised that "substantial improvement is expected." (Doc. #19, Ex. 3 at 58-60; Doc. #19, Ex.

4 at 1-6).  Plaintiff added numerous comments to her Year End Review, stating her belief that she had "improved greatly from the previous annual review period" and resolving that "[i]n those areas where my manager and I have distinctly different perceptions I will work diligently to better understand her definition and perception of those things." (Doc. #19, Ex. 4 at 5).

In February 2011, Plaintiff received another Corrective Action Form ("Final Warning"), which demanded improvement in six areas: (1) "meet or exceed productivity measure of 103% and quality of 95%;" (2) "manage different tasks/responsibilities more effectively and with a sense of urgency, processing in date order, to achieve goals and process within department standards;" (3) "improve quality of work and documentation on Policy Tracker;" (4) "follow instructions more consistently;" (5) improve desk organization so that you can improve your own performance and others can locate work if you are out of the office;" and (6) "use PTO in the correct fashion, cease entering unnecessary transactions and improper verbiage as requested." (Doc. #19, Ex. 4 at 9-11).  As in the past, the Final Warning threatened termination of employment for "[f]ailure to begin immediate improvement, to consistently meet these standards and to sustain acceptable performance." (Doc. #19, Ex. 4 at 11).

Feeling that her situation was being handled unfairly, Plaintiff "took the matter to human resources," talking with Malaika Kattke (a black female) on March 1, 2011. (Doc. #19, Ex. 1, Pl. Dep. at 210, 245, 309).  On March 8, 2011, Plaintiff informed Ms. Kattke that white workers on her team were "allowed to do things differently" and that she felt Ms. Nichols treated her differently because her race. (Doc. #19, Ex. 1, Pl. Dep. at 248-49).  Ms. Kattke subsequently contacted Ms. Nichols about Plaintiff's complaint, but "race never came up." (Doc. #19, Ex. 5, Nichols Dep. at 29).  Ms. Kattke also contacted Sally Bryant, a Second Vice President and Ms. Nichols' superior, about Plaintiff's complaint. (Doc. #19, Ex. 1, Pl. Dep. at 232; Doc. #19, Ex. 5,

Nichols Dep. at 29-30).  Plaintiff met once with Ms. Bryant, and then a second time with both Ms. Bryant and Ms. Nichols. (Doc. #19, Ex. 1, Pl. Dep. at 232).  At this second meeting, it was discovered that Plaintiff was processing transactions differently than other team members. (Doc. #19, Ex. 1, Pl. Dep. at 232).  Subsequently, Plaintiff's production was re-calculated in accordance with the methods used by all team members and she was given credit for any discrepancies in productivity that may have existed. (Doc. #19, Ex. 1, Pl. Dep. at 234).  After the processing procedures were corrected, Plaintiff never raised the topic again with her supervisors. (Doc. #19, Ex. 1, Pl. Dep. at 251-52).

On March 2, 2011, Ms. Nichols counseled Plaintiff by email about her disorganized desk. (Doc. #19, Ex. 4 at 13).  On March 31, 2011, Ms. Nichols emailed Plaintiff in regards to a clocking-in error that incorrectly inflated Plaintiff's productivity numbers. (Doc. #19, Ex. 4 at 18-20).  On April 1, 2011 and April 6, 2011, Ms. Nichols met with Plaintiff to follow up on her most recent Final Warning. (Doc. #19, Ex. 4 at 13-15).  At these meetings, Ms. Nichols informed Plaintiff that her performance and conduct were still not meeting expectations. (Doc. #19, Ex. 4 at 13-15).  Ms. Nichols also met with Plaintiff on May 4, 2011 and May 20, 2011, at which times Plaintiff was still not meeting expectations. (Doc. #19, Ex. 4 at 21-22, 26-27).  Ms. Nichols met with Plaintiff again on June 2, 2011. (Doc. #19, Ex. 4 at 30-31).  On a form used to memorialize the meeting, Ms. Nichols addressed Plaintiff by writing:

> Bridgit, you have made improvement in some areas but overall your performance continues to not meet expectations.  This level of performance has a direct impact on the quality of service provided to our customers.  Immediate improvement is expected by June 7, 2011.  You should be able to process independently, with a greater sense of urgency while providing quality results.  Failure to meet these standards and to sustain acceptable performance by June 7, 2011 and after will result in further disciplinary action, up to and including termination of employment.

(Doc. #19, Ex. 4 at 31).  By June 7, 2011, Plaintiff's work was still not meeting expectations, but Ms. Nichols gave her an extension, setting June 21, 2011 as Plaintiff's deadline for meeting expectations. (Doc. #19, Ex. 4 at 35-36).

On June 21, 2011, Plaintiff was terminated because of job performance issues. (Doc. #19, Ex. 4 at 37-38).   The decision to terminate Plaintiff was made by Ms. Nichols, who first consulted with Patrick West, her direct supervisor, and Ms. Kattke in Human Resources. (Doc. #19, Ex. 5, Nichols Dep. at 48-49).  Ms. Nichols and Crystal Lent, a Human Resources Partner in Birmingham, were present for the termination meeting, while Ms. Kattke listened in by speakerphone. (Doc. #19, Ex. 1, Pl. Dep. at 207, 246; Doc. #19, Ex. 5, Nichols Dep. at 50).

Plaintiff is not aware of any white members of the Special Processing Team who had a similar number of counselings, warnings, and final warnings and escaped termination.[3] However, Plaintiff does believe that three white, female co-workers (Amanda Merriman, Debra Waldrep, and Mary Jean Brantley) had similar performance issues, but were not disciplined in same manner by Ms. Nichols. (Doc. #19, Ex. 1, Pl. Dep. at 371-73).  Ms. Merriman worked on the complex team within the Special Processing Team, while Ms. Waldrep and Ms. Brantley worked with Plaintiff on the status team. (Doc. #19, Ex. 5, Nichols Dep. at 57-58, 32; Doc. #19, Ex. 6, Nichols Dec. at ¶ 11).   In regard to Ms. Waldrep, Ms. Nichols recalled, "To my recollection, I have not had to counsel or issue any warnings (including any final warnings) to

---

[3] Plaintiff's Deposition:

> Q: Are you aware of any white employee on your team, on the special processing team, who had as many counselings, warnings, and final warnings as you and wasn't terminated?

> A: No, I'm not familiar with any.

Doc. #19, Ex. 1, Pl. Dep. at 373.

Ms. Waldrep.  Ms. Waldrep received Meets Expectations on both her 2009 and 2010 Annual

Reviews." (Doc. #19, Ex. 6, Nichols Dec. at ¶ 12).  As to Ms. Brantley, Ms. Nichols stated:

> Ms. Brantley had some performance issues on the Special Processing Team.
> When performance issues arose, I issued counseling, discipline and warnings to
> Ms. Brantley.  When needed, I emailed Ms. Brantley about following procedures
> and limiting her personal phone calls.  I also sent memorandums to Ms. Brantley
> outlining her performance problems.  On occasion, I issued verbal and written
> warnings to Ms. Brantley about the quality and accuracy of her work and her
> excessive phone calls.  Despite some performance problems (and resulting
> counselings and warnings), Ms. Brantley received Meets Expectations on her
> 2010 Annual Review.  She did not receive Needs Improvement or Does Not Meet
> in any areas.

(Doc. #19, Ex. 6, Nichols Dec. at ¶ 14).  Despite her sense that white employees were treated

more favorably, Plaintiff never heard any racially derogatory statements during her time at

Protective. (Doc. #19, Ex. 1, Pl. Dep. at 78, 228-29, 286-87).

Attendance-related issues did not play a role in Plaintiff's dismissal (Doc. #19, Ex. 6,

Nichols Dec. at ¶ 8), but her attendance was at times irregular, a reality that seems to have

resulted from a serious health condition. (Doc. #19, Ex. 1, Pl. Dep. at 297-98).  In November

2008, for instance, Plaintiff submitted FMLA medical certification forms and requested FMLA

leave, which was granted for a period spanning late 2008 and early 2009. (Doc. #19, Ex. 1, Pl.

Dep. at 297-98).  Plaintiff did not submit any further medical certification forms after 2008.

(Doc. #19, Ex. 1, Pl. Dep. at 298).  On March 23, 2011, Plaintiff requested by email that Priscilla

Dempsey, a HR specialist, classify a recent absence as FMLA qualified leave. (Doc. #19, Ex. 4

at 42-43).  Ms. Dempsey responded that Plaintiff needed to provide updated certification forms

before any leave could be classified as FMLA leave. (Doc. #19, Ex. 4 at 42).  Plaintiff is not sure

whether she turned in the requested forms. (Doc. #19, Ex. 1, Pl. Dep. at 299).  Notwithstanding

these issues related to leave requests, Plaintiff does not recall a time during her employment at

Protective when she was ever denied leave or an instance when a manager or HR representative ever said anything negative about her FMLA leave. (Doc. #19, Ex. 1, Pl. Dep. at 304-05).

Plaintiff filed a Charge of Discrimination with the EEOC on September 22, 2011. (Doc. #1, Ex. 1). The EEOC issued a finding of "No Cause" on May 30, 2012. (Doc. #1, Ex. 1). Plaintiff initiated her suit against Defendant on August 31, 2012. (Doc. #1).

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If

the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

If the moving party bears the burden of proof at trial, it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (*i.e.*, facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial, but does not require evidence negating the nonmovant's claim; it simply requires the movant to show that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.

If the movant meets its initial burden by using this second method, the nonmoving party may either rely on evidence in the record, overlooked or ignored by the movant, sufficient to

withstand a directed verdict, or the nonmoving party may come forward with additional evidence

that is sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations,

but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.    Discussion

After careful review of the Rule 56 record and the parties' briefs, and for the reasons

stated below, the court concludes that Defendant's motion is due to be granted.

### A.    Overview of Defendant's Arguments in Support of Summary Judgment

Plaintiff's Complaint (Doc. #1) includes eight causes of action: (1) racial discrimination

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); (2) racially

hostile work environment in violation of Title VII (Count II); (3) retaliation on the basis of race

in violation of Title VII (Count III); (4) racial discrimination in violation of 42 U.S.C. § 1981

("Section 1981") (Count IV); (5) racially hostile work environment in violation of Section 1981

(Count V); (6) retaliation on the basis of race in violation of Section 1981 (Count VI); (7)

interference in violation of the Family and Medical Leave Act of 1993 ("FMLA") (Count VII);

and (8) retaliation in violation of the FMLA (Count VIII).

Defendant's Motion (Doc. #18) seeks judgment as to all of Plaintiff's claims pursuant to

Federal Rule of Civil Procedure 56.  Indeed, in its Supporting Brief (Doc. #20), Defendant

argues that (1) Plaintiff's hostile work environment and retaliation claims under Title VII

(Counts II & III) are due to be dismissed for failure to exhaust administrative remedies, (2)

Plaintiff's Title VII and Section 1981 discrimination claims (Counts I & IV) are due to be

dismissed, because she cannot establish a *prima facie* case of discrimination, (3) in any event,

even if Plaintiff is capable of demonstrating a *prima facia* case of discrimination, her Title VII and Section 1981 claims (Counts I & IV) are due to be dismissed because she is unable to show that Defendant's reasons for terminating her were pretextual, (4) Plaintiff's hostile work environment claims under Title VII and Section 1981 (Counts II & V) are due to be dismissed because she has not advanced any factual allegations that would support such claims, (5) Plaintiff's Title VII and Section 1981 retaliation claims (Counts III & VI) are due to be dismissed because she has failed to demonstrate that she engaged in protected activity and/or that Defendant's adverse employment action bore a causal relationship to her protected activity, and (6) Plaintiff's FMLA claims (Counts VII & VIII) are due to be dismissed, because she has failed to set forth any factual allegations to support such claims.  Defendant's arguments and Plaintiff's responses are addressed below.

> **B.    Plaintiff's Title VII Hostile Work Environment and Retaliation Claims Are Due to Be Dismissed for Failure to Exhaust Administrative Remedies**

When a plaintiff wishes to pursue an action under Title VII, she must first exhaust her administrative remedies—that is, she must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). 42 U.S.C. § 2000e-5(e)(1).  Furthermore, the scope of a judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.  *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970);[4] *see also Gregory v. Ga. Dep't of Human Res*., 355 F.3d 1277, 1280 (11th Cir. 2004) ("[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").  In other words, a plaintiff must include in her charge the factual basis for any

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

and all of her Title VII claims in order to properly exhaust her administrative remedies. *See, e.g.*, *Thomas v. Miami Dade Public Health Trust*, 369 F. App'x 19, 22 (11th Cir. 2010) (noting that any "acts of retaliation that occurred prior to the date of the EEOC charge that were not included in the charge were not exhausted and could not be considered by the district court."), *reh'g en banc denied*, 402 Fed. App'x 513 (2010).

This is not a case where the alleged retaliatory conduct arose after the filing of the charge. In such an instance, a plaintiff may exhaust administrative prerequisites without the refiling of a charge because the retaliation claim is deemed to have grown out of the administrative charge or the reasonable investigation of the charge. *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. Unit A Aug. 1981). In *Gupta*, the plaintiff filed two EEOC charges and then commenced his lawsuit arising out of those charges. *Id.* at 413. While the case was pending, the plaintiff was notified his employment contract would not be renewed. *Id.* Despite his contention that the termination was retaliatory, he never filed a charge with the EEOC alleging the retaliation. Under those circumstances, the Eleventh Circuit readily concluded that it was unnecessary for the plaintiff to file a charge with the EEOC before amending his complaint to include a retaliation claim, because that claim necessarily grew out of the administrative charge that properly was before the district court. *Id.* at 414.

Nor is this a case in which the facts stated in the charge were sufficient to have placed a reasonable EEOC investigator on notice that, notwithstanding her failure to mark the "retaliation" box on the EEOC charge, Plaintiff was also complaining about retaliation. Thus, this case is distinguishable from decisions such as *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (finding there were sufficient facts included in a plaintiff's race and sex EEOC charge to trigger an investigation into possible retaliation). Contrary to the

situation in *Gregory*, here facts alleged in Plaintiff's charge were not sufficient to suggest an investigation into a hostile environment claim was warranted.

In addition, Plaintiff not only failed to check the retaliation box contained in the charge, but she failed to raise any factual allegations of retaliation in the body of her EEOC charge. (Doc. #1, Ex. 1 at 1).  Plaintiff also failed to include in the charge any factual allegations regarding a hostile work environment.  (*Id.*)  Indeed, Plaintiff's charge only asserted discriminatory conduct and contained no indication that Plaintiff was asserting hostile work environment or retaliation claims.  Therefore, Plaintiff's hostile work environment and retaliation claims are barred for failure to exhaust administrative remedies.  *See Thomas*, 369 F. App'x at 22 (retaliation); *Cotton v. G.S. Dev.*, 390 F. App'x 875, 877 (11th Cir. 2010) (hostile work environment).

### C. Defendant Is Entitled to Summary Judgment on the Merits of Plaintiff's Claims Under Title VII and Section 1981

Alternatively, even when Plaintiff's exhaustion deficiencies are set aside, the court concludes that all of Plaintiff's claims under Title VII and Section 1981 (Counts I-VI) are due to be dismissed on the merits at the summary judgment stage.  Plaintiff's various claims are addressed below.[5]

### 1. Plaintiff's Racial Discrimination Claims

Absent direct evidence of racial discrimination (of which there is none in the Rule 56 record),[6] Title VII and Section 1981 claims are evaluated according to the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[5] *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and Section 1981] have the same requirements of proof and use the same analytical framework [*McDonnell Douglas*], therefore we shall explicitly address the Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well.").

[6] (Doc. #19, Ex. 1, Pl. Dep. at 78, 228-29, 286-87).

792 (1973) and its progeny. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). Under this analytical structure, a plaintiff may meet her initial burden establishing a *prima facie* case of racial discrimination by showing that (1) she belongs to a certain race, (2) she suffered an adverse job action, (3) her employer treated similarly situated employees outside of her race in a more favorable manner, and (4) she was qualified for the job in question. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  "[I]f the plaintiff successfully demonstrates a *prima facie* case, the burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason." *Dickinson v. Springhill Hosps., Inc.*, 187 F. App'x 937, 939 (11th Cir. 2006).  This burden is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).  "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

Here, Plaintiff claims that she was subjected to racial discrimination in violation of Title VII and Section 1981. Specifically, she contends that she was terminated on the basis of her race. As will be highlighted below, Plaintiff's claims (Counts I & IV) falter at multiple levels of the *McDonnell Douglas* framework.

First and foremost, Plaintiff is unable to establish a *prima facie* case of discrimination, as she has made no showing (and the Rule 56 record contains no evidence to suggest) that Defendant treated her less favorably than similarly situated persons outside of her protected group. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [she] and the employees are similarly situated *in all relevant aspects*."

*Holifield*, 115 F.3d at 1562 (emphasis added).  Indeed, "[i]n a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to [her]." *Cooper v. Southern Co.*, 390 F.3d 695, 735-36 (11th Cir. 2004) (quotation, citation, and emphasis omitted).  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (emphasis omitted).

Plaintiff seems to suggest the existence of three comparators in the present case: Amanda Merriman, Debra Waldrep, and Mary Jean Brantley. (Doc. #19, Ex. 1, Pl. Dep. at 371-73). However, the undisputed Rule 56 evidence makes it quite clear that two of the purported comparators, Amanda Merriman and Debra Waldrep, are simply not comparators.  Indeed, Merriman worked in a different division (the complex team) of the Special Processing Team and Waldrep had no job performance issues during the relevant period (Doc. #19, Ex. 5, Nichols Dep. at 57-58; Doc. #19, Ex. 6, Nichols Dec. at ¶ 12).  Neither Merriman nor Waldrep can serve as suitable comparators to Plaintiff. *Holifield*, 115 F.3d at 1562 (noting that Plaintiff and her comparators must be "similarly situated in all relevant aspects").  Furthermore, while there is evidence that Brantley was the subject of frequent counseling, discipline, and warnings, it is undisputed on this record that her job performance issues did not begin to approach the severity of Plaintiff's, as evidenced by the fact that she never received a Final Warning or a "Needs Improvement" on any of her annual reviews. (Doc. #19, Ex. 6, Nichols Dec. at ¶ 14). Accordingly, Ms. Brantley is not a proper comparator, *Dent v. Fed. Mogul Corp*., 129 F. Supp. 2d 1311, 1314 (N.D. Ala. 2001) (quoting *Holifield*, 115 F.3d at 1562) ("[I]n order to be considered 'similarly situated' for purposes of proving a *prima facie* case, an employee allegedly

receiving lesser or no discipline than the plaintiff must have been involved in or accused of the 'same or similar' misconduct"), and Plaintiff is unable to demonstrate a *prima facie* case of discrimination.

Alternatively, even assuming *arguendo* that Plaintiff was able to establish a *prima facie* case of discrimination, Defendant would still be entitled to summary judgment on Plaintiff's discrimination claims (Counts I & IV).  This is the case because Plaintiff has failed to demonstrate that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff is pretextual.  Defendant has frequently articulated that Plaintiff was fired for poor job performance, but Plaintiff argues that Defendant's reasoning is pretextual, pointing to her abnormally frequent subjection to auditing as evidence of discrimination.  Unfortunately, rather than showing that Defendant's "reason was false, and that discrimination was the real reason," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), Plaintiff's auditing argument reinforces the legitimacy of Defendant's articulated reason, for it is as tautological as it is true that frequent auditing is consistent with monitoring someone who is performing poorly. Accordingly, Plaintiff has failed to "meet [Defendant's] reason head on and rebut it," *Chapman v. AI Transp.*, 299 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (addressing a shortcoming in the analysis of the burden shifting related to a claimant's ADEA claim), and Defendant is entitled to summary judgment on Plaintiff's Title VII and Section 1981 claims (Counts I & IV).

### 2.    Plaintiff's Hostile Work Environment Claims

A hostile work environment claim under Title VII and/or Section 1981 is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21

16

(1993).  As such, a plaintiff wishing to establish a hostile work environment claim must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See, e.g.*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (applying these factors in the context of a hostile environment sexual harassment claim).

Here, Plaintiff's hostile work environment claims under Title VII were not included in her EEOC charge. But even if they were, her Title VII and Section 1981 claims are due to be dismissed, for an alternative reason: Plaintiff has failed to set forth any factual allegations that support such claims.  In fact, Plaintiff's own testimony stands in direct opposition to any attempts she may make to maintain hostile work environment claims. (Doc. #19, Ex. 1, Pl. Dep. at 78, 228-29, 286-87).  Indeed, Plaintiff testified as follows at deposition:

> Q:  Are you claiming that the company, anyone at the company, gave offensive race-oriented verbal kidding, teasing, or joking?  You're not claiming that, are you?
>
> A: No.
>
> Q: You're not claiming that anyone gave repeated racial abuse or abuse of a racial nature, are you?
>
> A: No, I'm not claiming that.
>
> Q: You're not claiming that anybody gave graphic or degrading comments about your race, are you?
>
> A: No.
>
> Q:  You're not claiming that anyone gave offensive visual conduct, including leering or anything of a racial nature like that, are you?

A: Could you be more specific?

Q: No.

A: Okay.

Q: Are you claiming that anyone gave obscene racial writings to you or showed you obscene racial things?

A: No.

(Doc. #19, Ex. 1, Pl. Dep. at 286-87).  The lack of any factual allegations regarding a hostile work environment, emphasized in the exchange above, dooms Plaintiff's claims under such a theory, and entitles Defendant to summary judgment on Counts II and V of Plaintiff's Complaint.

### 3.        Plaintiff's Retaliation Claims

The court has already explained why Plaintiff's retaliation claims are due to be dismissed due to her failure to administratively exhaust them. In addition, her Title VII and Section 1981 retaliation claims lack merit based upon the Rule 56 record. Retaliation claims are evaluated under the familiar *McDonnell Douglas* framework, pursuant to which a plaintiff bears the initial burden of establishing a *prima facie* case of retaliation.  A plaintiff can make a *prima facie* showing by demonstrating that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal connection between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1556 (11th Cir. 1997).

Here, Plaintiff asserts that she was terminated in retaliation for lodging complaints of racial discrimination with Ms. Kattke in March 2011. (Doc. #19, Ex. 1, Pl. Dep. at 336-37; Doc. #23 at 19-22).  As such, Plaintiff has demonstrated that she engaged in protected activity (reporting racial discrimination to the human resources department) and suffered an adverse

employment action (her termination in June 2011), thereby making a sufficient showing as to the first two elements of a *prima facie* case of retaliation.  And although there seems to be some question as to whether Ms. Nichols--the ultimate decision maker in regard to Plaintiff's termination--was even aware that Plaintiff had complained of racial discrimination (Doc. #19, Ex. 5, Nichols Dep. at 29), the court nevertheless assumes without deciding that Plaintiff has demonstrated a causal connection (at least for *prima facie* purposes), due to the close temporal proximity between Plaintiff's protected activity (March 2011) and Defendant's adverse employment action (June 2011).

However, for the reasons already discussed, Plaintiff's retaliation claims do not survive Rule 56 scrutiny, because she is unable to sufficiently rebut Defendant's articulated explanation for her termination.  As already explained, there simply is no basis in the Rule 56 record to call into question Defendant's explanation that Plaintiff was terminated because of her poor performance.   Indeed, Plaintiff presents no evidence to suggest that Defendant's proffered reasoning was pretext for discriminatory retaliation, meaning that she has failed to carry her ultimate burden.  As a result, summary judgment is due to be granted against Plaintiff's Title VII and Section 1981 claims (Counts III and VI).

### D.  Defendant Is Entitled to Summary Judgment on the Merits of Plaintiff's Claims Under the FMLA

"The FMLA provides that an 'eligible employee' is entitled to a maximum of twelve weeks of leave during which her employment status is protected.  The FMLA recognizes two types of claims for alleged violations of these provisions: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, and retaliation claims, in which employers discharge employees for exercising their FMLA right to leave." *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th

Cir. 2000) (internal citations omitted).  Although Plaintiff purports to pursue both types of FMLA claims (Counts VII & VIII), she cannot do so successfully, and the court concludes that Defendant is entitled to summary judgment on Plaintiff's FMLA claims for the reasons stated below.

### 1.      Plaintiff's Interference Claim

In order to state a claim for interference, "a plaintiff need only demonstrate that [she] was entitled to but denied [a substantive FMLA] right.  [She] does not have to allege that [her] employer intended to deny the right; the employer's motives are irrelevant." *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001).  Here, Plaintiff has not identified any instances in which she was denied FMLA leave; in fact, she has testified to the contrary, declaring that she couldn't recall ever being denied FMLA leave during her time at Protective. (Doc. #19, Ex. 1, Pl. Dep. at 304).

However, to the extent that Plaintiff seeks to base her interference claim on her March 2011 FMLA classification request (Doc. #19, Ex. 4 at 42-43), that claim necessarily fails. Plaintiff did not provide Protective with updated medical certification forms, as may be required under the FMLA. 29 C.F.R. § 825.305(e) (An "employer may require the employee to provide a new medical certification in each subsequent leave year"); *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1385 (11th Cir. 2005) (An "employee cannot merely demand leave; [she] must give the employer a reason to believe [she] is entitled to it.").  Plaintiff has not presented any viable FMLA interference claim.  As such, Defendant is entitled to summary judgment on Plaintiff's FMLA interference claim (Count VII).

####    2.    Plaintiff's Retaliation Claim

In order to successfully pursue a retaliation claim, "an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207.  This represents a heavier burden than that borne by an FMLA "interference" Plaintiff.

Here, Plaintiff has wholly failed to meet her burden.  That is, Plaintiff has presented absolutely no facts whatsoever to suggest that her termination was tied to her exercise of FMLA rights.  In fact, Plaintiff has candidly conceded that she does not recall ever being denied FMLA leave, nor does she remember any Protective managers or H.R. representatives speaking about her FMLA leave in a negative manner. (Doc. #19, Ex. 1, Pl. Dep. at 304-05).  Accordingly, Plaintiff is unable to successfully maintain her FMLA retaliation claim (Count VIII), and Defendant is due to be granted summary judgment as to such claim.

## V.    Conclusion

For the reasons stated above, Defendant's Motion (Doc. #18) is due to be granted.  A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this August 20, 2014.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE